# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

HAILEE R. DESOUZA,

Plaintiff,

v.

PARK WEST APARTMENTS, INC.  et al.
Defendant.

No. 3:15-CV-01668 (MPS)

## RULING ON MOTION FOR SUMMARY JUDGMENT

### I.    Introduction

Hailee R. DeSouza ("DeSouza") brings this suit[1] against his landlord, Park West

Apartments, Inc., and The Community Builders, Inc., the nonprofit corporation that controls it

(collectively "Park West").[2]  DeSouza chiefly claims that Park West racially discriminated and

retaliated against him by repeatedly attempting to evict him.  He also claims that Park West

violated his privacy rights by informing other tenants of the eviction proceedings and that Park

West's former property manager, Kim Doughtie, falsely accused him of sexually assaulting her

daughter and granddaughter.  He sets out claims against Park West for: (i) race discrimination

and retaliation in violation of the Fair Housing Act ("FHA") (Counts 1, 2, and 3); (ii) violation of

the First Amendment (Count 4); (iii) violation of the Fourth Amendment (Count 5); (iv)

---

[1] This case was consolidated with a similar case filed by DeSouza—DeSouza v.
Community Builders, Inc., 3:17-CV-00016 (MPS), in May of 2017.  (See ECF No. 90 (order
granting Park West's motion for consolidation); ECF No. 91 (Notice of Consolidation).)

[2] Since Community Builders, Inc., and Park West are part of the same entity, I refer to
the defendants collectively as Park West throughout this ruling for convenience.

interference, coercion or intimidation in violation of 42 U.S.C. § 3617 of the FHA (Count 6); (v)

discrimination and retaliation in violation of 42 U.S.C. § 1981 (Count 7); (vi) violation of the

Privacy Rights Act of 1974, 5 U.S.C. § 552a ("Privacy Act") (Count 8); and (vii) common law

slander and intentional infliction of emotional distress for Ms. Doughtie's alleged false sexual

assault allegation[3] (Count 9).  (*See* ECF No. 100-2 at 17-19).

Park West now moves for summary judgment on all counts.  (ECF No. 128).  For the

reasons set forth below, Park West's motion for summary judgment is GRANTED IN PART

AND DENIED IN PART.  The motion is denied with respect to the portion of DeSouza's

retaliation claims under the FHA concerning Park West's filing of an affidavit of noncompliance

in March of 2015 (Counts 1, 2, 3, 6), and granted with respect to the remainder of his claims.

## II.    Factual Background

### a.  Eviction Proceedings

The following facts, which are taken from the parties' Local Rule 56(a) Statements and

the exhibits, are undisputed unless otherwise indicated.  DeSouza applied to rent and received a

"Section 8 assisted two bedroom apartment with a basement at Park West" "approximately

[thirteen] years ago."  (ECF No. 130, Defendant's Local Rule 56(a)1 Statement ("Def.'s L.R.

56(a)1 Stmt.") at ¶ 4); ECF No. 151-1, Plaintiff's Local Rule 56(a)2 Statement ("Pl.'s L.R.

56(a)2 Stmt.") at ¶ 4.)  Although DeSouza received several "KAPA letters"—i.e., pre-

termination notices provided in cases of lease violations— and notices to quit prior to the events

---

[3] DeSouza did not name Ms. Doughtie as a defendant in this action.

underlying this case, he remained in his apartment continuously through the beginning of 2014. (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 9-10, 13, 41; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 9-10, 13, 41.)[4]

In January of 2014, DeSouza attained a position with "Swift Worldwide as a senior project engineer." (Def.'s L.R. 56(a)1 Stmt. at ¶ 6; Pl.'s L.R. 56(a)2 Stmt. at ¶ 6.) He retained this position until April of 2014. (*Id.*) Given his change in income upon attaining this position, DeSouza had to "complete an interim recertification" to retain his Section 8 subsidy. (Def.'s L.R. 56(a)1 Stmt. at ¶ 7; Pl.'s L.R. 56(a)2 Stmt. at ¶ 7.) Here, the parties' accounts diverge. Park West contends that DeSouza did not complete the interim recertification process, and that it issued a KAPA letter to him "on or about March 3, 2014 advising him that he had to recertify in accordance with his lease requirements within 35 days" to prevent the termination of his rental agreement. (Def.'s L.R. 56(a)1 Stmt. at ¶ 8.) DeSouza avers that the interim recertification process "only require[d] him to report his new income" and that he performed this obligation. (Pl.'s L.R. 56(a)2 Stmt. at ¶ 8.) DeSouza did not take any further steps to complete the recertification in accordance with Park West's directives within the thirty-five day period; Park West subsequently issued him a Notice to Quit on April 22, 2014. (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 11-12; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 11-12.)

On June 12, 2014, DeSouza received an eviction notice for failing to complete the recertification process in violation of his lease. (Def.'s L.R. 56(a)1 Stmt. at ¶ 14; Pl.'s L.R. 56(a)2 Stmt. at ¶ 14.) He retained a lawyer, Edward Taiman, to represent him in the eviction action. (Def.'s L.R. 56(a)1 Stmt. at ¶ 15; Pl.'s L.R. 56(a)2 Stmt. at ¶ 15.) The parties' accounts once again split off regarding the subsequent eviction proceedings. Park West avers that the

---

[4] Although DeSouza contends in his Local Rule Statement that the KAPA letters he received from Park West were baseless (*see* Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 9-10, 13, 41), he does not deny that he received the letters nor that he remained in his apartment.

parties successfully mediated the matter with a housing court mediator on August 29, 2014, resulting in the execution of an Agreement providing, among other things, that DeSouza agreed to "complete the recertification process." (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 17-18.) DeSouza recounts a more complex version of events, averring that Park West conspired with the housing mediator—who falsely posed as the Superior Court judge's secretary—in coercing DeSouza to sign the stipulated agreement. (Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 17-18 (averring that DeSouza "was acting on coerced-induced-made-to-believe orders as coming from defendants [sic] criminally and [falsely] imaginary created non-existent UFO eviction court judge with unlawful fabricated inducted [sic] orders, with already falsely made-up crafted instructions, already falsely made-up crafted directives, of defendants['] purported stipulation agreement" (emphases omitted) (some internal quotation marks omitted).)[5] In any event, the Stipulated Agreement—which was signed by each of the parties—provided in relevant part that DeSouza "agrees to complete the recertification process" on "September 3, 2014" and that "[b]oth parties shall be respectful and courteous to one another." (*See* ECF No. 130-8, Exhibit H, at 2 ("Stipulated Agreement").) The latter language was added based on DeSouza's recommendation. (Def.'s L.R. 56(a)1 Stmt. at ¶ 19; Pl.'s L.R. 56(a)2 Stmt. at ¶ 19.)

The parties' September 3, 2014 recertification meeting went poorly. During the meeting, Park West staff asked several times whether DeSouza was recording them. (Def.'s L.R. 56(a)1 Stmt. at ¶ 21; Pl.'s L.R. 56(a)2 Stmt. at ¶ 21.) DeSouza responded several times that "I do not

---

[5] DeSouza filed various claims against the housing mediator who worked with the parties, and against his counsel; I dismissed both sets of claims in separate actions prior to this ruling. *See DeSouza v. Kennedy*, No. 3:16-CV-01126, 2017 WL 3431393, at *1 (D. Conn. Aug. 9, 2017) (dismissing the claims against the housing mediator); *DeSouza v. Taiman*, No. 3:16-CV-00490, 2017 WL 3444672, at *1 (D. Conn. Aug. 10, 2017) (dismissing the claims against DeSouza's lawyer).

answer to you" and refused to confirm one way or another whether he was recording the meeting.[6]  (*Id.*; *see also* ECF No. 130-9 at 1, Exhibit I ("Exhibit I") (audio recording of the proceeding filed manually with the Court).)  Park West subsequently filed with the Superior Court "an Affidavit of non-compliance with the stipulation on September 4, 2014."  (Def.'s L.R. 56(a)1 Stmt. at ¶ 22; Pl.'s L.R. 56(a)2 Stmt. at ¶ 22.)  The affidavit noted as follows:

> On August 27, 2014[7] [the] parties entered into a stipulated agreement.  The parties agreed that a recertification will [sic] take place on Wednesday, September 3, 2014 between 12:00 p.m. and 1:00 p.m.  Both parties shall be respectful and courteous to one another.  The defendant came to the plaintiff's office for recertification at the time stated in paragraph 4 [of the Stipulated Agreement].  It was noticed that recording devices were being used by him and his son.  We asked if we were being recorded.  Mr. [DeSouza] son [sic] nodded his head yes but Mr. [DeSouza] [sic] refused to tell us.  He said I do not answer to you over and over.  He became loud, volatile and scary.  We fear him [sic] and asked him to leave.

(ECF No. 130-10, Exhibit J at 2 ("First Affidavit of Noncompliance").)  A "hearing was held [on the matter] before Superior Court Judge Rupal Shah on September 12, 2014."  (Def.'s L.R. 56(a)1 Stmt. at ¶ 23; Pl.'s L.R. 56(a)2 Stmt. at ¶ 23.)  Judge Shah reserved decision at the conclusion of the hearing and never issued an order.  (Def.'s L.R. 56(a)1 Stmt. at ¶ 25; Pl.'s L.R. 56(a)2 Stmt. at ¶ 26.)

On December 16, 2014, "as [DeSouza] still had not completed his recertification, . . . he was served with a Notice of Intent to Remove Subsidy, which notified [DeSouza] that he would

---

[6]  DeSouza concedes in his Local Rule Statement that both he and his son, Eugene DeSouza, who was also present at the recertification meeting, were recording the meeting with Park West Staff.  (*See* Pl.'s L.R. 56(a)2 Stmt. at ¶ 21 (noting the existence of "Real-Time Live six (6) minute approx. audio recordings . . . captured by both [DeSouza] and son" (emphases omitted)).)  The recording, which was submitted to the Court by both parties, demonstrates that the parties' meeting started off in a promising manner but slowly devolved after DeSouza refused to answer a Park West staff member's question concerning whether he was recording the meeting.  (*See* Exhibit I.)

[7]  The Stipulated Agreement submitted by the parties is dated August 29, 2014.  (*See* Stipulated Agreement.)

be required to pay a [Department of Housing and Urban Development ("HUD")] approved market rent for his unit." (Def.'s L.R. 56(a)1 Stmt. at ¶ 26; Pl.'s L.R. 56(a)2 Stmt. at ¶ 26.; *see also* ECF No. 130-12, Exhibit L at 2 ("Notice of Intent to Remove Subsidy").) Temporary Staffing Resources ("TSR"), which had helped DeSouza obtain employment in November of 2014, "ultimately verified his income on or about December 29, 2014 via [an] Employment Verification form sent by Park West to TSR."[8] (Def.'s L.R. 56(a)1 Stmt. at ¶ 28; Pl.'s L.R. 56(a)2 Stmt. at ¶ 28.) Since the information supplied by TSR demonstrated that DeSouza "was earning $69 per hour, Park West advised [him] on January 14, 2015, that his HUD subsidy had been terminated effective December 1, 2014, and [that] his new rent would be $1352.00 per month." (Def.'s L.R. 56(a)1 Stmt. at ¶ 29; Pl.'s L.R. 56(a)2 Stmt. at ¶ 29.) While Park West contends that the "HUD rent schedule indicates that the unsubsidized rent for a two-bedroom unit with a basement is $1352.00 per month" (Def.'s L.R. 56(a)1 Stmt. at ¶ 30 (citing ECF No. 130-15, Exhibit O at 2(HUD rent schedule for low income housing indicating that the "Rent Per Unit" for a "2 Bedroom, w/ Basement" apartment was $1,352))), DeSouza argues that he should have been able to rent the unit for $989 per month—the rate that he contends was advertised to the general public. (*See* Pl.'s L.R. 56(a)2 Stmt. at ¶ 30 (citing ECF No. 151-8, Plaintiff's Exhibit ("Pl.'s Exh.") 54 at 12 (advertising "2 BR Market With Basement $989/month H/HW Included")).)

After DeSouza refused to pay the $1,352 rent, Park West subsequently "filed a second Affidavit of noncompliance with the [Stipulated Agreement] on March 11, 2015" "[d]ue to his

---

[8] The plaintiff avers in his Local Rule Statement that he had sent Park West a letter in early November of 2014 noting that he had obtained such employment. (*See* Pl.'s L.R. 56(a)2 Stmt. at ¶ 28.) He admits, however, that TSR sent the letter in question to Park West verifying his income from that employment.

failure to pay the increased rent, and because he had repeatedly referred to Ms. Doughtie in grossly disparaging terms. . . ."[9]  (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 31-32; Pl.'s L.R. 56(a)1 Stmt. at ¶¶ 31-32.)[10]  In the affidavit, Park West avers that DeSouza's use of discourteous language directed toward itself and Kim Doughtie, a Park West manager, violated part five of the parties' Stipulated Agreement.  (*See* ECF No. 130-17 at 2, Exhibit Q, Affidavit of Noncompliance ("Second Affidavit of Noncompliance").)  Park West noted in the affidavit that DeSouza had used various epithets to refer to it and had, amongst other discourtesies, compared Ms. Doughtie to Charles Manson and Susan Smith, a woman who had drowned her two young children in South Carolina.[11]  (*See id.*)

_____

[9]  DeSouza included as an exhibit to his objection to Park West's motion for summary judgment a copy of the Superior Court docket for Park West's eviction proceedings against him.  (*See* ECF No. 151-7, Pl.'s Exh. 45, at 19-21 ("Superior Court Docket").  The docket notes three entries for "Affidavits of Noncompliance with Stipulation"—one on September 8, 2014, one on March 13, 2015, and one on February 17, 2015.  (*See id.*)  Since the parties only mention two affidavits and refer to the March, 2015 affidavit as the "second" such affidavit, however, I presume for the sake of this ruling that only two such affidavits were filed.

[10]  DeSouza contends that he did not pay the increased rent because a Superior Court judge ruled in his favor on the matter.  (*See* Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 31-32.)  In support of this contention, he cites a Superior Court docket entry dated February 17, 2015 reading as follows: "Affidavit of Noncompliance with Stipulation – Summary Process *Result*: Denied 2/27/2015 Hon Stanley Fuger."  (*See* Superior Court docket).  DeSouza does not cite any materials beyond this docket entry, however, and nothing supports his contention in his Local Statement that Judge Fuger's ruling meant that he "ha[d] absolute[ly] no obligation to anyone whatsoever [to] do anything."  (*See* Pl.'s L.R. 56(a)2 Stmt. at ¶ 32 (emphases omitted).)  Further, the transcript of the hearing before Judge Fuger on February 27, 2015, which the plaintiff included in his exhibits, suggests that the judge did not issue a ruling at that time.  (*See* ECF No. 151-8, Pl.'s Exh. 58, at 31 (Judge Fuger notes that he was going to send the parties "back to the Housing folks" as "[t]here seems to be ground that [the parties] can [use to] come to some agreement here").)

[11]  DeSouza does not deny that he used such language towards Ms. Doughtie and, indeed, refers to her in his Local Statement as "belligerent, deceitful, volatile, manipulative . . ., [and] out-of-control."  (Pl. L.R. 56(a)2 Stmt. at ¶ 32.)  As the Second Circuit has noted, "[c]ourts can adjudicate disputes only when the parties present reasoned arguments rather than invective-laden diatribes."  *Koehl v. Greene*, 424 F. App'x 61, 62 (2d Cir. 2011).  The fact that DeSouza is "representing himself in this matter does not relieve him of his obligation to respect the dignity

Judge Prats of the Superior Court subsequently held hearings on March 27, 2015 and April 24, 2015. (Def.'s L.R. 56(a)1 Stmt. at ¶ 33; Pl.'s L.R. 56(a)2 Stmt. at ¶ 33.) She issued a Memorandum of Decision on June 22, 2015. (*See* ECF No. 130-18, Exhibit R, Memorandum of Decision In Re: Affidavit of Noncompliance Dated August 29, 2014 ("Memorandum of Decision").) In this memorandum, she found "that [Park West] ha[d] proved by a preponderance of the evidence that [DeSouza] did in fact violate paragraph three of the [Stipulated Agreement], by not paying the use and occupancy at the higher rate once he no longer qualified for the [Section 8] subsidy." (*Id.* at 3.) She noted, however, that Park West had proven a violation of paragraph four of the Stipulated Agreement—i.e., the paragraph requiring him to complete the recertification process—"only in part, because it was not clear from the record that Mr. DeSouza's failure to complete the recertification process was truly willful." (*Id.*) With regard to the increased rent of $1,352 per month charged to DeSouza, Judge Prats concluded that such rent was not excessive, as DeSouza had argued, but rather in accordance with the rent schedules proffered by Park West. (*See id.* at 3-4.) She therefore concluded that DeSouza was obligated to pay that amount for the months he was employed.[12] (*Id.* at 4.) Judge Prats found that Park West

of the proceeding. . . ." *Id.*; *see also McDonald v. Head Criminal Ct. Supervisor Officer*, 850 F.2d 121, 124 (2d Cir. 1988) ("[W]hile pro se litigants may in general deserve more lenient treatment than those represented by counsel, all litigants, including pro ses, have an obligation to comply with court orders. When they flout that obligation they, like all litigants, must suffer the consequences of their actions."). DeSouza is hereby advised that should he continue to level personal ad hominem attacks against Park West or its agents, he could suffer sanctions up to and including dismissal of his case. *See Morris v. Antonio*, No. 14-CV-1749 (AMD)(LB), 2016 WL 5660373, at *4 (E.D.N.Y. Sept. 30, 2016) (advising plaintiff that should "her pattern of behavior and insulting language" continue, it could support sanction of dismissal).

[12] Judge Prats noted that DeSouza had stated previously that he was no longer employed as of April 24, 2015. (*See* Memorandum of Decision at 4.)

had failed to prove by a preponderance of the evidence that DeSouza had committed any other violations of the Stipulated Agreement. (*Id.* at 5.)

DeSouza paid the outstanding arrearage to Park West in July of 2015 in compliance with Judge Prats' order. (Def.'s L.R. 56(a)1 Stmt. at ¶ 37; Pl.'s 56(a)2 Stmt. at ¶ 37.) Since that time, DeSouza has continued to live in his apartment.[13] (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 41-43; Pl.'s 56(a)2 Stmt. at ¶¶ 41-43.) He currently pays only $25.00 per month for utilities and nothing in rent. (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 43-44; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 43-44.)

**b. DeSouza's HUD Complaints**

On February 18, 2014, DeSouza filed a complaint with HUD offices in Washington, DC, and Boston, Massachusetts. (Def.'s L.R. 56(a)1 Stmt. at ¶ 45; Pl.'s L.R. 56(a)2 Stmt. at ¶ 45.) The complaint recounted a variety of DeSouza's disputes with Park West staff, alleging among other things that Park West management had informed him that they wanted him to leave his apartment. (*See* ECF No. 130-21, Exhibit U, February 18, 2014 Complaint to HUD ("February Complaint").) Park West avers that it was "not copied on the February 18, 2014 complaint, and [that] there is no evidence that [it was] put on notice of the complaint prior to sending [DeSouza] the Notice to Quit." (Def.'s L.R. 56(a)1 Stmt. at ¶ 46.) DeSouza denies this statement. (Pl.'s L.R. 56(a)2 Stmt. at ¶ 46.) DeSouza sent another copy of this letter to HUD offices in Washington and Boston on March 18, 2014. (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 47-48; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 47-48; ECF No. 130-22, Exhibit V, March 18, 2014 Complaint to

---

[13] Park West notes in its Local Statement that DeSouza "has never been evicted from his apartment nor has he ever been denied admission to his apartment in any way," and that his lease has been renewed every year since 2014. (Def.'s L.R. 56(a)1 Stmt. at ¶¶ 41-42.) DeSouza contests both of these statements on the grounds that Park West attempted to evict him in 2014 and 2015, and that his lease "has not been [renewed] for rental lease years [2013-2018]." (Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 41-42.) He does not deny, however, that he has remained in his apartment through this period.

HUD ("March Complaint").)  As with the previous complaint, the parties dispute whether Park

West received a copy of the letter prior to issuing its notice to quit to DeSouza in April of 2014.

(*Compare* Def.'s L.R. 56(a)1 Stmt. at ¶ 49 (averring that Park West was not copied on the March

18, 2014 letter and did not receive a copy prior to issuing its notice to quit to DeSouza) *with* Pl.'s

L.R. 56(a)2 Stmt. at ¶ 49 (denying that proposition).)

On April 23, 2014—the day he received a notice to quit—DeSouza "mailed a document

containing three questions" to various HUD personnel and Park West.  (Def.'s L.R. 56(a)1 Stmt.

at ¶ 50; Pl.'s L.R. 56(a)2 Stmt. at ¶ 50.)  Two of the questions concerned Park West's conduct

during the recertification process, while the other asked about Park West employees' ability to

smoke in HUD rental offices.  (*See* ECF No. 130-23, Exhibit W at 2 ("April Letter").)  On the

same day, according to Park West, DeSouza "mailed a letter to [Park West] Attorney Neil Paul

advising him, for the first time, of the February 18, 2014 complaint to HUD and the March 18,

2014 follow-up letter."  (Def.'s L.R. 56(a)1 Stmt. at ¶ 51.)  DeSouza denies this contention,

averring that he has "never mailed [any of his HUD complaints] dated 02/18/2014 or 03/18/2014

to [Park West's] eviction atty. Neil Paul whatsoever."  (Pl.'s L.R. 56(a)2 Stmt. at ¶ 51.)

"Between October 8, 2014 and October 11, 2014," DeSouza filed either four or five more

complaints with HUD and various other parties, including Representative Joe Courtney and the

Chief Architect of Park West.  (Def.'s L.R. 56(a)1 Stmt. at ¶ 52 (averring that he filed four such

complaints); Pl.'s 56(a)2 Stmt. at ¶ 52 (averring that he filed five such complaints).)  The

complaints chiefly alleged that Park West violated DeSouza's right to privacy by informing other

tenants about the eviction proceedings against him.  (*See* ECF No. 130-25, Exhibit Y ("October

Complaints").)

### c.  Other Relevant Conduct

DeSouza testified in his deposition to several other incidents. He stated that "[i]n August, 2014, a young girl who is also a resident of Park West allegedly said to [him] "why are you here? Park West doesn't want you here. So why you here?" (Def.'s L.R. 56(a)1 Stmt. at ¶ 53; Pl.'s L.R. 56(a)2 Stmt. at ¶ 53.) He also alleged separately that "another tenant was told about the eviction proceedings against him." (Def.'s L.R. 56(a)1 Stmt. at ¶ 54; Pl.'s L.R. 56(a)2 Stmt. at ¶ 54.) Finally, DeSouza stated that "[o]n or about July 27, 2014, . . . Ms. Doughtie told the police that [DeSouza] [had] raped her daughter and her 10 or 20 month old granddaughter and left them in a pool of blood." (Def.'s L.R. 56(a)1 Stmt. at ¶ 55; Pl.'s L.R. 56(a)2 Stmt. at ¶ 55.)

### d. Plaintiff's Complaint

As noted previously, DeSouza sets out five counts against Park West based upon race discrimination and retaliation; four of them fall under the FHA while the fifth invokes 42 U.S.C. § 1981. (*See* ECF No. 100-2 at 17-19.) He also alleges that Park West violated his First Amendment rights by discriminating against him based upon his race and by retaliating against him. (*Id.* at 18.) He avers that Park West violated his Fourth Amendment rights by attempting to evict him "with the sole intent to destabilize [his] household and security . . . ." (*Id.*) DeSouza further claims that Park West violated his rights under the Privacy Act by informing other tenants of the eviction proceedings against him. (*Id.* at 19.) Finally, he sets out one count of slander and intentional infliction of emotional distress against Park West based upon Ms. Doughtie's alleged accusations that he sexually assaulted her daughter and granddaughter. (*Id.*)

## III. Standard of Review

Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making that determination, a court must view the evidence in the

light most favorable to the opposing party." *Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014) (internal quotation marks omitted). "A fact is material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). The moving party bears the burden "of showing that no genuine factual dispute exists . . ., and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences" in favor of the non-moving party. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995).[14]

## IV.  Discussion

### a.  Racial Discrimination Claims (Counts 1, 2, 3 and 7)[15]

DeSouza advances three claims of racial discrimination under the FHA[16] and one under 42 U.S.C. § 1981.  (ECF No. 100-2 at 17-19.)  I begin with the FHA racial discrimination claims.  The FHA prohibits "discriminat[ion] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race. . . ." 42 U.S.C. § 3604(b).  Courts evaluate FHA discrimination claims under the "*McDonnell Douglas* burden-shifting framework." *Mitchell v. Shane*, 350 F.3d

---

[14]  In accordance with this Court's Local Rules, Park West filed a "Notice to Self-Represented Litigant" regarding the procedure for responding to a motion for summary judgment.  (ECF No. 131); *See* D. Conn. L.R. 56(b) ("Any represented party moving for summary judgment against a self-represented party must file and serve, as a separate document . . . a 'Notice to Self-Represented Litigant Concerning Motion for Summary Judgment.'").

[15] Since Counts 1, 2, 3, and 7 plead both claims of racial discrimination and retaliation, I address each of these causes of action separately.

[16]  All three of DeSouza's FHA claims advance the same claims concerning racial discrimination—i.e., that Park West "grossly discriminated against [DeSouza] because of race and color." (*See* ECF No. 100-2 at 17-18).  I therefore address these claims concurrently.

39, 47 (2d Cir. 2003). Under that framework, "once a plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 702-03 (1973)). "If the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action . . . . Summary judgment is appropriate if no reasonably jury could find that the defendant's actions were motivated by discrimination." *Id.* (internal citation omitted).

To set out a prima facie case of discrimination under the FHA, "a plaintiff must show that: (1) he is a member of a protected class; (2) that the defendant took adverse action against him; and (3) that the adverse action took place under circumstances giving rise to an inference of discrimination." *Mazzocchi v. Windsor Owners Corp.*, 204 F. Supp. 3d 583, 615 (S.D.N.Y. 2016). The parties do not dispute that DeSouza, as an African American, is a member of a protected class. Although the parties differ regarding whether DeSouza suffered an adverse action[17], I need not resolve this dispute given DeSouza's failure to present a shred of evidence

---

[17]  Park West contends that DeSouza has not suffered an adverse action because he "has never been evicted from his apartment nor has he ever been denied admission to his apartment in any way." (ECF No. 129 at 14.) There is a circuit split regarding whether the FHA countenances post-acquisition discrimination claims short of eviction. *Compare, e.g.*, *The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 713 (9th Cir. 2009) (concluding that the "FHA reaches post-acquisition discrimination"); *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1223 (11th Cir. 2016) (concluding 42 U.S.C. § 3604 countenanced claim of discrimination concerning attempted eviction where plaintiffs remained in the property); *with Cox v. City of Dallas, Tex.*, 430 F.3d 734, 746 (5th Cir. 2005) (concluding that the FHA did not encompass post-acquisition discrimination claims not alleging actual or constructive eviction"); *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 329 (7th Cir. 2004) (reaching similar conclusion). Although the Second Circuit has yet to weigh in on this dispute, several district courts in this circuit have concluded that 42 U.S.C. § 3604 reaches post-acquisition discrimination claims not alleging actual or constructive eviction. *See, e.g.*, *Mazzocchi v. Windsor Owners Corp.*, 204 F. Supp. 3d 583, 607 (S.D.N.Y. 2016) ("[T]he Court finds that Section 3604(f)(2) of the FHA reaches post-acquisition conduct—even where that conduct falls short of constructive or actual eviction. . . ."); *Viens v. Am. Empire Surplus Lines*

that any such adverse action took place under circumstances giving rise to an inference of discrimination. A party may establish an inference of discrimination in several ways. First, the Second Circuit has held, in interpreting Title VII,[18] that a party may raise such an inference by demonstrating that she has been treated "less favorably than a similarly situated [party] outside [her] protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). The Second Circuit has also noted that a plaintiff may satisfy "this element of the prima facie case by showing direct evidence of discriminatory animus, such as 'remarks made by decisionmakers that could be viewed as reflecting [such] animus.'" *Henry v. New York State*, 842 F. Supp. 2d 530, 553 (S.D.N.Y. 2012) (construing Title VII) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)).

Since DeSouza does not argue that he was treated less favorably than other similarly situated parties outside of his protected group (*see, e.g.* ECF No. 151-1 at 1-2 (conceding that there were other African American tenants at Park West), 14 (noting that he lacks knowledge as to Park West's eviction practices regarding "Caucasian, Hispanic, and African American tenants")), his discrimination claim rests upon his argument that certain statements made by Park West personnel evidence racial animus. (*See* ECF No. 151-2 at 3 (contending that Park West's

---

*Ins. Co.*, 113 F. Supp. 3d 555, 569 (D. Conn. 2015) (concluding that 42 U.S.C. § 3604(b) countenanced discrimination claim against insurer that allegedly charged higher rates on discriminatory basis); *Khodeir v. Sayyed*, No. 15 CIV. 8763 (DAB), 2016 WL 5817003, at *4 (S.D.N.Y. Sept. 28, 2016) (concluding that 42 U.S.C. § 3604(b) countenanced discrimination claim predicated on harassment short of eviction); *Davis v. City of New York*, 902 F. Supp. 2d 405, 436 (S.D.N.Y. 2012) (concluding that 42 U.S.C. § 3604(b) "is best understood to prohibit post as well as pre-acquisition discrimination in the provision of housing related services").

[18] "Courts, including the Second Circuit, have consistently relied on Title VII cases in their analysis of housing discrimination under the FHA." *See United States v. E. River Hous. Corp.*, 90 F. Supp. 3d 118, 135 n. 17 (S.D.N.Y. 2015) (quoting *Lax v. 29 Woodmere Blvd. Owners, Inc.*, 812 F. Supp. 2d 228, 234 n. 4 (E.D.N.Y. 2011)).

"own emails" constituted evidence "of unlawful eviction plots and derogatory statements about [Desouza].").  DeSouza cites the following emails from Park West personnel as evidence of discriminatory animus:

- An email exchange that took place on April 24, 2014 between Ms. Doughtie, Nancye[19] Frank, a HUD Project Manager, and Tony Berthod, a director for Park West, concerning DeSouza's HUD complaints, in which Ms. Doughtie notes that "[t]here is an active court case for Mr. DeSouza that I am not sure I should speak about."  (ECF No. 151-5, Pl.'s Exh. 28 at 29.)

- A continuation of the email chain above in which Mr. Berthod notes that he will "reach out" to DeSouza but that he would "have a limited conversation based on the fact that [DeSouza] has a legal case pending."  (ECF No. 151-5, Pl.'s Exh. 29 at 31.)  Mr. Berthod also notes that "there appear[ed] to be a couple of issues" with DeSouza, "[o]ne being his occupancy, not residing in the unit [a]nd [the other being] unreported income as a result of an income discrepancy report from [Enterprise Income Verification] during his last annual recertification [in] November of 2013."  (*Id.*)

- An email exchange between Ms. Doughtie and Mr. Berthod on September 5, 2014 in which both note their view that DeSouza is mentally unstable.  (*See* ECF No. 151-9, Pl.'s Exh. 61 at 2.)  In particular, Mr. Berthod sent an email to Ms. Doughtie noting that "[DeSouza] appears to be mentally unstable" and advising her to "inform [her attorney that she is] in fear of [DeSouza] and have them [sic]

---

[19] Ms. Frank's first name is spelled in emails with an "e" at the end.  (*See, e.g.* ECF No. 151-5, Pl.'s Exh. 28 at 29.)

slap a restraining order-no contact or no trespass on him to keep him away from [Ms. Doughtie] and the office staff. . . ." (*Id.*). Ms. Doughtie replies that she "left a message for our attorney to apply for a protective order" and that "[DeSouza] is very unstable, every action he takes every letter he has written shows that." (*Id.*)

- An email exchange between Mr. Berthod and Ms. Frank on August 15, 2014, in which Mr. Berthod notes that "[w]e are looking to evict [DeSouza] for unreported income and not living at the site for extended periods of time." (ECF No. 151-9, Pl.'s Exh. 63, at 4.)[20] He also avers that "[DeSouza] has also been taking photographs and videos of the staff and residents among a host of other really strange and disturbing things on the property." (*Id.*)

- An email from Ms. Doughtie to Mr. Berthod on September 5, 2014, in which Ms. Doughtie notes her fear of DeSouza. (ECF No. 151-9, Pl.'s Exh. 63, at 6.) In particular Ms. Doughtie states: "I need my company to back me in this situation to see this man for what he is!!! We at this point are deathly afraid of this man. Our concern is that he is going to take the final step off the cliff and harm us." (*Id.*)

There is one other email chain in the same vein as the communications listed above contained in the record.[21] The email exchange in question, which took place between Ms.

---

[20] Plaintiff's Exhibit 65 contains a duplicate of this email exchange. (*See* ECF No. 151-9, Pl.'s Exh. 65, at 11.)

[21] Although DeSouza did not cite or produce this email chain in his response to Park West's motion for summary judgment, the Court may consider it for the purposes of determining whether summary judgment is warranted. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

Doughtie and Attorney Paul on February 26, 2015, begins with an email from Ms. Doughtie stating as follows:

> This letter was hand delivered about 15 minutes ago by Desouza himself. I am hoping you can get this man evicted. I consider his words a hate crime which [sic] is against the law. It is also untrue slander. I have never had an accident let alone a hit and run. Being a lawyer please tell me how to stop this person????

(ECF No. 88-2 at 3.)[22]

While these communications demonstrate a level of hostility between Park West personnel and DeSouza, they do not establish any racial animus on the part of the former. As an initial matter, none of the remarks reference race. *See Jackson v. Post Univ., Inc.*, 836 F. Supp. 2d 65, 94 (D. Conn. 2011) (concluding that although an employee's "remark was tasteless and derogatory," it did not give rise to an inference of discrimination in part because "it [did] not explicitly or specifically reference race"). Second, DeSouza does not contend nor does the record reflect that any of the remarks above or their context implicitly reference race in any manner. *Contrast, e.g.*, *Curtis v. Airborne Freight Corp.*, 87 F. Supp. 2d 234, 251 (S.D.N.Y. 2000) (noting that employee's remark was racist despite lack of specific reference to race because it was based on racist stereotypes); *Hayes v. Cablevision Sys. New York City Corp.*, No. 07-CV-2438 RRM, 2012 WL 1106850, at *9 (E.D.N.Y. Mar. 31, 2012) ("A facially neutral insult could constitute harassment motivated by racial animus if uttered in an environment otherwise marked by abundant racial animosity or under circumstances that render it an expression of racial antipathy." (internal quotation marks omitted)).

In the end, DeSouza's only salient contention is that he subjectively construed the admittedly hostile remarks recounted above as evidence of racial animus on the part of Park

---

[22] The letter is not attached to the email and has not been provided to the Court.

West.  This is not enough, however, to support an inference of discrimination.  *See Pearson v. Bd. of Educ.*, 499 F. Supp. 2d 575, 593 (S.D.N.Y. 2007) (employee's racially neutral insults toward plaintiff could not be construed as "race-based remarks" despite plaintiff's subjective interpretation of them); *Rajaravivarma v. Bd. of Trustees for Connecticut State Univ. Sys.*, 862 F. Supp. 2d 127, 152 (D. Conn. 2012) (reaching similar conclusion regarding employee's insult toward plaintiff).  DeSouza "has done little more than cite to [his alleged] mistreatment and ask the court to conclude that it must have been related to [his] race.  This is not sufficient."  *Grillo v. New York City Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) (quoting *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001)).  I therefore conclude that DeSouza has failed to set out a prima facie case of racial discrimination in violation of the FHA.

Even if DeSouza had set out a prima facie case, Park West has set forth a valid non-discriminatory rationale for the actions it took against him.  DeSouza concedes in his Local Rule 56 Statement that he did not cooperate with Park West's recertification process and that he only reported his new income.  (ECF No. 151-1 at 2 (averring that HUD regulations only required him to report his new income to Park West).)  This, according to DeSouza, was his only obligation—Park West was supposed to do the rest.  (*Id.*)  But the very regulations DeSouza cites in support of this claim undermine it.  These regulations require the owner of a HUD multifamily complex to undertake a detailed process in recertifying a tenant who provides notice of a change in income.  (See ECF No. 151-4, Pl.'s Ex. 15 at 45 (listing a HUD regulation requiring an owner completing an interim recertification to take several steps, including interviewing the tenant, obtaining third-party verification of the new income, and obtaining the tenant's signature on the interim recertification).)  While these steps are concededly the responsibility of the owner, they also require the cooperation of the tenant with respect to paperwork and the interview.  Given

that DeSouza acknowledges that he did nothing more than provide notice of his new income,

Park West had cause to take action against him.  *See* U.S. Dep't Hous. & Urban Dev., HUD

Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs § 8–

13 (Nov. 2013) ("HUD Handbook"), available at

http://portal.hud.gov/hudportal/documents/huddoc?id=43503HSGH.pdf (noting that "Owners

may terminate tenancy when a tenant is in material noncompliance with the lease including . . .

[f]ailure of the tenant to submit in time all required information on household income and

composition").

In any event, Park West gave DeSouza ample opportunity to complete the recertification

process prior to initiating eviction proceedings.  (*See* Def.'s L.R. 56(a)1 Stmt. at ¶ 8 (noting

DeSouza received letter on March 2, 2014 giving him 35 days to complete recertification

process); Pl.'s L.R. 56(a)2 Stmt. at ¶ 8 (conceding this point).)  After DeSouza received a notice

to quit on April 22, 2014, he nonetheless still failed to complete the recertification process

required by Park West.  He and his counsel then entered into a Stipulated Agreement conceding

judgment to Park West on that issue, subject to a stay of execution pursuant to certain conditions.

(*See* Stipulated Agreement.)  The legitimacy of the Park West's decision to terminate DeSouza's

housing subsidy and to raise his rent to $1,352 for the months he was employed was verified by

Judge Prats.  (*See* Memorandum of Decision at 2-3 (concluding that Park West charged DeSouza

the correct amount of rent for the months he was employed in late 2014 and early 2015).)

Finally, Park West's affidavits of noncompliance decried DeSouza's discourteous behavior

toward Park West employees.  Thus, contrary to DeSouza's position, Park West did have a non-

discriminatory rationale for the actions it took against him.

Finally, DeSouza has failed to point to any evidence in the record indicating that Park West's rationale was pretext for race discrimination.

For these reasons, I grant Park West's motion for summary judgment with respect to DeSouza's FHA discrimination claims. Since housing discrimination claims brought under 42 U.S.C § 1981 are also "analyzed under the *McDonnell Douglas* Test," I grant Park West summary judgment on that claim as well. *Mitchell v. Century 21 Rustic Realty*, 233 F. Supp. 2d 418, 437 (E.D.N.Y.), aff'd, 45 F. App'x 59 (2d Cir. 2002); *Rhodes v. Advance Prop. Mgmt., Inc.*, No. 3:10-CV-826 (JCH), 2012 WL 12904797, at *8 (D. Conn. Aug. 30, 2012) ("As with housing discrimination claims under the FHA and section 1981, section 1982 claims are subject to *McDonnell-Douglas* analysis.").

### b. Retaliation Claims (Counts 1, 2, 3, 6, and 7)

DeSouza's retaliation claims present a closer question. He contends that Park West's actions against him constituted retaliation for the letters he wrote to HUD complaining of Park West's purported racial discrimination towards him. (*See* ECF No. 100-2 at 17-18.)

### i. FHA Retaliation Claims (Counts 1, 2, 3, and 6)

I begin with DeSouza's retaliation claims under the FHA (Counts 1, 2, 3, and 6).[23] The Fair Housing Act provides that:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of [the FHA].

---

[23] The plaintiff brings four counts of retaliation under the FHA, all of which center around the same conduct as his discrimination claims. (*See* ECF No. 100-2 at 17-18.)

42 U.S.C. § 3617. To establish retaliation in violation of 42 U.S.C. § 3617, a plaintiff must demonstrate: "(1) that the plaintiff was engaged in a protected activity; (2) that the [defendant] was aware of this activity; (3) that the [defendant] took adverse action against the plaintiff; and (4) that a causal connection exists between the protected activity and the adverse action." *Robbins v. Connecticut Inst. for the Blind*, No. 3:10CV1712 JBA, 2012 WL 3940133, at *6 (D. Conn. Sept. 10, 2012). The "*McDonnell-Douglas* burden-shifting rules [apply] to claims of retaliation" under the FHA. *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 54 (2d Cir. 2002) ("*RECAP*"), *superseded by statute on other grounds*, ADA Amendments of 2008, Pub. L. No. 110-325, 122 Stat. 3553. Hence, "[i]f a plaintiff establishes a prima facie case, the defendant has the burden to produce a legitimate non-retaliatory reason for its action." *Joseph's House & Shelter, Inc. v. City of Troy*, N.Y., 641 F. Supp. 2d 154, 160 (N.D.N.Y. 2009) (internal emphasis omitted). If the defendant carries this burden, the plaintiff must then "show that the defendant's proffered reason is not worthy of credence or that the reason is mere pretext for a retaliatory action." *Id.*

### A. Prima Facie Case

I begin with whether DeSouza has established a prima facie case. "Protected activity under the FHA refers to 'action taken to protest or oppose statutorily prohibited discrimination.'" *Miller v. Bd. of Managers of Whispering Pines at Colonial Wood Condo. II*, 457 F. Supp. 2d 126, 131 (E.D.N.Y. 2006) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)). HUD regulations have interpreted 42 U.S.C. § 3617 to prohibit "[r]etaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the [FHA]." 24 C.F.R. § 100.400. DeSouza's complaints do not appear to complain directly of discriminatory conduct. Rather, as mentioned above, they

complain chiefly of a variety of disputes with Park West staff and in particular staff's alleged representations that they wanted DeSouza out of his apartment. (*See, e.g.*, February Complaint at 2-10 (complaining of his treatment at the hands of Park West staff); March Complaint at 2-10 (same)). Nonetheless, they do contain passages in which DeSouza appears to be accusing Park West staff of racial discrimination. (*See, e.g.*, February Complaint at 3 (noting that DeSouza told Park West staffer that she "seemed to be angry and upset for an African American or a minority making or income changes [sic]"), 6 (DeSouza suggesting that he faced an eviction threat for certain conduct while his son reported that other white tenants in his building were not threatened with eviction); October Complaints at 9 (claiming Park West's actions violated DeSouza's civil rights).) Further, Park West does not argue that the plaintiff's complaints do not constitute protected activity. (*See* ECF No. 129 at 17.); *Goenaga v. Mar. of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists."). As such, I conclude that the plaintiff has raised a genuine issue of material fact concerning whether his complaints constitute protected activity under the FHA.

The awareness requirement of the prima facie case presents a closer issue. Park West contends that there is no evidence that it was aware of DeSouza's complaints to HUD prior to the issuance of its notice to quit in April of 2014. (ECF No. 129 at 17.) The record, however, is not as clear cut as Park West argues. The complaints filed by DeSouza in February and March of 2014 denote the receiving parties and concedly do not list any Park West personnel. (*See* February Complaint (February, 2014 complaint addressed to HUD's headquarters in Washington, D.C., along with three other HUD personnel in that office); March Complaint (March, 2014 complaint addressed to the same parties)).) Further, DeSouza testified in his

deposition that he could recall providing copies of the complaints only to the recipients listed in the complaints and possibly to HUD's office in Boston. (*See* ECF No. 130-2, Exhibit B, Affidavit of Hailee DeSouza ("DeSouza Aff.") at 45-46 (DeSouza notes that he could only recall sending copies of the February, 2014 HUD complaint to the individuals listed as recipients in the complaint and possibly to HUD's Boston office), 47-48 (same with respect to March, 2014 HUD complaint).) DeSouza included a HUD regulation in his objection, however, stating that HUD would "send a letter and a copy of [any complaint filed] to the party [accused of discrimination]" "[w]ithin 10 days of receiving [the] signed complaint. . . ." (ECF No. 151-10, Pl.'s Exh. 70 at 3.) This raises a genuine issue of material fact regarding whether Park West was aware of DeSouza's complaints prior to the issuance of the notice to quit.[24]

I now turn to the adverse action requirement of the prima facie case. Park West's initiation of eviction proceedings in June of 2014, along with its submissions of affidavits of noncompliance in September of 2014 and March of 2015 (*see* Superior Court Docket), all constitute adverse actions under 42 U.S.C. § 3617.[25] *See Reyes v. Fairfield Properties*, 661 F. Supp. 2d 249, 267 n. 10 (E.D.N.Y. 2009) ("[T]he Court . . . concludes that an eviction proceeding could constitute an adverse action under [42 U.S.C. § 3617]."); *Wentworth v. Hedson*, 493 F. Supp. 2d 559, 571 (E.D.N.Y. 2007) (concluding that summary judgment was not

---

[24] On April 24, 2014—the day after DeSouza received the notice to quit from Park West—, he mailed a document containing three questions to various parties including Park West. (Def's L.R. 56(a)1 Stmt. at ¶ 50; Pl.'s L.R. 56(a)2 Stmt. at ¶ 50.) On the same day, Mr. Berthod emailed Ms. Doughtie and Ms. Frank about DeSouza's "tenant complaint," suggesting that Park West was definitely aware of DeSouza's complaints by this point. (*See* ECF No. 151-5, Pl.'s Exh. 29 at 31.)

[25] While one could argue that submitting an affidavit of noncompliance is different in kind from initiating eviction proceedings, these actions functionally amounted to the same act in this case given that the affidavits of noncompliance constituted an attempt to lift the stay of execution on the eviction proceeding against DeSouza.

warranted on plaintiff's retaliation claim under 42 U.S.C. § 3617 predicated on defendant's initiation of eviction proceedings against her*); Robbins v. Connecticut Inst. for the Blind*, No. 3:10CV1712 JBA, 2012 WL 3940133, at *7 (D. Conn. Sept. 10, 2012) (noting "that attempted evictions are considered 'adverse actions' under the FHA"); *Bloch v. Frischholz*, 587 F.3d 771, 782 (7th Cir. 2009) (concluding that even a threat of eviction can constitute a violation of 42 U.S.C. § 3617).  Park West's termination of DeSouza's HUD subsidy effective December 1, 2014 also constitutes an adverse action.[26]  *See RECAP*, 294 F.3d at 54 (holding that plaintiff "suffered an adverse action in losing funding that had been committed to it").

That leaves the question whether there was a causal connection between DeSouza's filing of the HUD complaints and Park West's adverse actions.  To meet this element, a plaintiff must demonstrate that the defendant possessed "a retaliatory motive" in taking adverse actions against him.  *Austin v. Town of Farmington*, 826 F.3d 622, 630 (2d Cir. 2016).  The Second Circuit has provided plaintiffs with at least two ways to meet this burden.  First, a plaintiff may set out proof of a causal connection between protected activity and an adverse action "indirectly by showing that the protected activity was closely followed in time by the adverse action."  *See RECAP*, 294 F.3d at 54 (internal quotation marks omitted).  The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001), however, and courts have construed this temporal factor with varying degrees of liberality.  *Compare, e.g.*, *Filipovic v. K & R Exp. Systems, Inc.*, 176 F.3d 390, 399 (7th Cir.

---

[26]  As noted above, Judge Prats determined that Park West's termination of the DeSouza's HUD subsidy was warranted.  (*See* Memorandum of Decision at 2-3 (concluding that Park West charged DeSouza the correct amount of rent for the months he was employed in late 2014 and early 2015).)

1999) (concluding four month lapse between protected activity and termination undermined retaliation claim) *with Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (concluding eight month period between plaintiff's protected activity and defendant's adverse action against him supported causal connection).  Second, a plaintiff may support a retaliation claim more directly by providing direct evidence of the defendant's retaliatory motive, such as a statement by the defendant indicating such motivation.  *See, e.g.*, *RECAP*, 294 F.3d at 54 (holding that defendant's comment that plaintiff "should not 'bite the hand that feeds it'" supported causal connection between protected activity and adverse action).  I set analyze the causal connection with respect to each adverse action below.

### 1. Commencement of Eviction Proceedings

Although the evidence in the record supporting a causal connection between DeSouza's filing of the HUD complaints and Park West's commencement of eviction proceedings against him in April of 2014 is scant, the existence of a close temporal relationship between them allows DeSouza to make out a prima facie case of retaliation.  As noted previously, DeSouza has raised a genuine issue of material fact regarding whether the defendant knew of his complaints within ten days of their filing.  Thus, when all reasonable inferences are drawn in favor of DeSouza, the record demonstrates that Park West sent DeSouza a notice to quit about a month after receiving notice of DeSouza's March, 2014 complaint to HUD.  This period is short enough to support a prima facie showing of causation indirectly through temporal proximity.  *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (concluding three week period between protected activity and adverse action sufficient to make out prima facie showing of causation); *Risco v. McHugh*, 868 F. Supp. 2d 75, 114 (S.D.N.Y. 2012) (holding less than two month period between protected activity and adverse action, by itself, made out prima facie case of retaliation).

### 2. September 2014 Affidavit of Noncompliance

The same cannot be said of Park West's filing of its first affidavit of noncompliance. As an initial matter, that affidavit was filed more than five months after DeSouza's April letter to HUD; this five-month period gives rise to a weak inference of causation at best. Further, that affidavit, which was sworn to by Ms. Doughtie, is clearly predicated on DeSouza's conduct at the parties' recertification meeting. In the affidavit, the full text of which is recounted above, Ms. Doughtie complains only of DeSouza's conduct at the recertification meeting. (*See* First Affidavit of Noncompliance (noting that DeSouza refused to say whether he was recording the parties' meeting and that he "became loud, volatile and scary").) Nothing in the affidavit suggests that Park West or its personnel harbored a retaliatory motive based on DeSouza's prior HUD complaints. Finally, the fact that the affidavit was filed the day after the parties' disastrous recertification meeting also supports the idea that it was filed in response to DeSouza's conduct at that event.

### 3. Termination of Housing Subsidy

In October of 2014, DeSouza filed either four or five more complaints with HUD, sending copies to various other entities including the Chief Architect of Park West. (Def's L.R. 56(a)1 Stmt. at ¶ 52; Pl.'s L.R. 56(a)2 Stmt. at ¶ 52). The next adverse action, however, took place in January of 2015 when Park West terminated DeSouza's housing subsidy effective December 1, 2014 in light of his income. (Def.'s L.R. 56(a)1 Stmt. at ¶ 29; Pl.'s L.R. 56(a)2 Stmt. at ¶ 29.) There is no indication in the record that Park West engaged in this action for purposes of retaliation. Rather, the record supports the view that Park West terminated DeSouza's subsidy because he was making too much money to qualify for it. Indeed, even DeSouza does not question Park West's decision to terminate his subsidy, but rather its decision

to charge him $1,352 in rent for his apartment. (*See* ECF No. 151-1 at 10-19 (contending that the market rent for the apartment was lower).) This argument, however, was foreclosed by Judge Prat's decision concluding that DeSouza did in fact owe $1,352 in rent for each month he was employed. (*See* Memorandum of Decision at 3-4.) I therefore conclude that DeSouza has failed to present a prima facie case of retaliation with respect to Park West's termination of his housing subsidy.

### 4. March 2015 Affidavit of Noncompliance

The remaining affidavit of noncompliance, however, is a different matter. Ms. Doughtie's February 26, 2015 email (ECF No. 88-2 at 2-3) expresses an animus toward DeSouza absent from the prior communications in the record. In that email, she notes to Attorney Paul that she is "hoping that you can get [DeSouza] evicted." (*Id.* at 3.) Significantly, she does not elaborate on any basis for such an eviction, suggesting that she wished DeSouza to be evicted as a general matter rather than as a result of specific misconduct on his part. Although Attorney Paul, to his credit, does not respond in kind, the email raises the inference that Park West's property manager possessed an intent to get DeSouza evicted at all costs. While the full text of the email suggests that Ms. Doughtie harbored animosity against DeSouza for accusing her of taking part in a "hit and run" (*id.*), it could also indicate a broader animus toward DeSouza based at least in part on his filing of the HUD complaints. Given that this email was sent by a Park West employee to a Park West attorney just a few weeks prior to the filing of Park West's second affidavit of noncompliance, it is highly probative of Park West's intent in filing that affidavit. DeSouza has therefore established a prima facie case of retaliation with respect to Park West's initiation of eviction proceedings against him in the spring of 2014 and its filing of the second affidavit of noncompliance in March of 2015.

**B. Non-Discriminatory Rationale and Pretext**

The burden then shifts to Park West to present a non-retaliatory reason for its commencement of eviction proceedings against DeSouza in the spring of 2014 and its filing of the second affidavit of noncompliance in March of 2015. Park West has successfully made this showing with respect to the former. As noted above, Park West avers that it commenced eviction proceedings against DeSouza because he failed to complete the recertification process in a timely manner. This constitutes a non-retaliatory rationale.

The burden then shifts to DeSouza to establish that this motive was pretext. DeSouza fails to make such a showing. As an initial matter, the record does not contain any direct evidence that Park West possessed such a motive in initiating eviction proceedings against DeSouza. The record is also nearly devoid of any indirect evidence of a retaliatory motive. The only such indirect evidence is the temporal correlation between DeSouza's filing of his HUD complaints and Park West's commencement of eviction proceedings. Mere temporal relation alone, however, is not enough to establish pretext. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("Although the] temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation . . ., without more, such temporal proximity is insufficient to satisfy [a party's] burden to bring forward some evidence of pretext . . . .").

Further, the remainder of the record strongly cuts against the contention that Park West's non-discriminatory rationale was pretextual. First, the context of Park West's actions cut against any inference of retaliatory intent. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006) (noting that "[c]ontext matters" in adjudicating whether an action was undertaken for retaliatory purposes). As noted above, Park West had legitimate reasons for initiating the

28

eviction proceedings against DeSouza. In addition, it provided DeSouza with ample time to complete the recertification process prior to initiating summary process against him. Second, Park West engaged in mediation with DeSouza and entered into a Stipulated Agreement that allowed him to remain in his residence with relatively few additional conditions attached. This remedial conduct negates any inference that Park West intended to retaliate against DeSouza for his HUD complaints. Third, Park West had sent the plaintiff KAPA letters numerous times in the past. (*See* Def.'s L. R. 56(a)1 Stmt. at ¶ 9; Pl.'s L.R. 56(a)2 Stmt. at ¶ 9.) This further negates any inference of retaliatory intent. *Cf. Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), *as amended* (June 6, 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). As such, I conclude that Park West is entitled to summary judgment with respect to DeSouza's retaliation claims concerning its initiation of eviction proceedings against him in the spring of 2014.

The March, 2015 affidavit presents a closer question. Park West contends that its March, 2015 affidavit of noncompliance was filed in good faith and that, in any event, the email from Ms. Doughtie is emblematic of her frustration with "[DeSouza's] unstable conduct," as opposed to his HUD complaints. (*See* ECF No. 153 at 4-5.) To be sure, the March, 2015 affidavit of noncompliance appears to aver that DeSouza had failed to comply with the Stipulated Agreement by failing to be courteous to Park West staff and by failing to pay the full amount of his rent.[27] (*See* Second Affidavit of Noncompliance). Ms. Doughtie's email, however, suggests

---

[27] The portion of the affidavit Park West attached to its motion for summary judgment as an exhibit does not include any language concerning DeSouza's rent and instead focuses solely on his disparaging conduct toward Park West personnel. (*See* Second Affidavit of Noncompliance.) As noted previously, DeSouza disputed his obligation to pay the increased rent; he did not dispute that Park West filed its affidavit of noncompliance at least in part on the

a broader intent—an intent to get DeSouza evicted by any means. While the email does not mention DeSouza's filing of prior HUD complaints, it does, when viewed in the light most favorable to DeSouza, *Tolan,* 134 S.Ct. at 1866, raise a genuine issue of material fact concerning whether Ms. Doughtie wanted DeSouza evicted at least in part on the basis of his prior HUD complaints.

Even if DeSouza's conduct provided Park West with just cause to file the affidavit of noncompliance, this improper motivation would still provide DeSouza with a viable claim for retaliation. In *Raniola v. Bratton*, the Second Circuit noted that a plaintiff may set out a viable retaliation claim "even when a retaliatory motive is not the sole cause of the adverse employment action, or when there were other objectively valid grounds for [the adverse action]." 243 F.3d 610, 625 (2d Cir. 2001) (internal quotation marks and citations omitted). In such instances, however, "[a] retaliatory motive must be . . . 'at least a substantial or motivating factor' behind the adverse action." *Id.* (quoting *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)) (some internal quotation marks omitted). A plaintiff may meet this burden "through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. Of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). Here, Ms. Doughtie's email provides such direct evidence of potentially retaliatory animus. Further, I cannot conclude that Park West was entirely justified in filing this affidavit of noncompliance given Judge Prats's conclusion that Park West had failed to prove by a preponderance of the evidence that DeSouza had been discourteous to Park West staff in violation of the parties' Stipulated Agreement. (*See* Memorandum of Decision at 5.) Finally, Park West did not argue that DeSouza's retaliation

---

basis that he had failed to pay this increased rent. (Def.'s L.R. 56(a)1 Stmt. at ¶ 32; Pl.'s L.R. 56(a)2 Stmt. at ¶ 32.)

claims failed because it would have taken the same actions against him regardless of his

protected activity. *See Mt. Healthy*, 429 U.S. at 287.

I therefore deny Park West's motion for summary judgment with respect to DeSouza's

retaliation claims relating to Park West's filing of the March, 2015 affidavit of noncompliance.

Park West's motion is granted with respect to the remainder of those claims.

### ii.      42 U.S.C. § 1981 Retaliation Claim

DeSouza's retaliation claim under 42 U.S.C. § 1981 is a different story. That statute,

passed in the aftermath of the Civil War, provides that:

> All persons within the jurisdiction of the United States shall have the same right in
> every State and Territory to make and enforce contracts, to sue, be parties, give
> evidence, and to the full and equal benefit of all laws and proceedings for the
> security of persons and property as is enjoyed by white citizens, and shall be subject
> to like punishment, pains, penalties, taxes, licenses, and exactions of every kind,
> and to no other.

42 U.S.C. § 1981(a). The statute defines the term, "make and enforce contracts," as "the

making, performance, modification, and termination of contracts, and the enjoyment of all

benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

The Supreme Court has held that the statute "encompasses retaliation claims" as well. *CBOCS*

*West, Inc. v. Humpries*, 553 U.S. 442, 446 (2008). The Supreme Court has also held, however,

that "[a]ny claim brought under § 1981 . . . must initially identify an impaired contractual

relationship, under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S.

470, 476 (2006). Here, DeSouza has failed to identify how Park West's alleged retaliation

against him for filing his HUD complaints has in any way impaired a contractual relationship.

While DeSouza possessed a statutory right under the FHA to file his complaints with HUD,

nothing in the record suggests that DeSouza also held a contractual right to file such complaints.

His claim under 42 U.S.C. § 1981 therefore fails as a matter of law. *See Miller v. City of*

*Bridgeport Police Dep't*, 718 F. App'x 49, 50 (2d Cir. 2017) (dismissing claim under 42 U.S.C. § 1981 due to plaintiff's failure to allege that "she has or would have rights under [an] existing or proposed contractual relationship with the defendant" (internal quotation marks omitted)).

I therefore grant Park West's motion for summary judgment with respect to DeSouza's retaliation claim under 42 U.S.C. § 1981.

### c. **First Amendment Claim (Count 4)**

DeSouza argues that Park West violated his First Amendment rights by "grossly discriminat[ing] against [him]" and by "retaliat[ing] against [him]" for filing his complaints with HUD. (ECF No. 100-2 at 18.) Since the First Amendment does not provide a cause of action for racial discrimination, I interpret DeSouza's contention as a First Amendment retaliation claim. As a general matter, a private citizen alleging a First Amendment retaliation claim "must prove: (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001). A plaintiff bringing such a claim, however, must also establish as a preliminary matter that the defendant's challenged conduct constitutes state action. *See United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 941 F.2d 1292, 1295 (2d Cir. 1991) ("Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." (internal quotation marks omitted)). "[S]tate action requires *both* an alleged constitutional deprivation caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible, *and* that the party charged with the

deprivation must be a person who may fairly be said to be a state actor." *Flagg v. Yonkers Sav. And Loan Ass'n, FA*, 396 F.3d 178, 186 (2d Cir. 2005) (internal quotation marks omitted).

DeSouza cannot establish that Park West[28] "may fairly be said to be a state actor." Both Park West Apartments, Inc., and The Community Builders, Inc. are private corporations. (*See* ECF No. 27 (defendants' corporate disclosure statement)). To demonstrate that a private actor's conduct constitutes state action, "a plaintiff must show that the allegedly unconstitutional conduct is fairly attributable to the [S]tate." *Cranley v. National Life Ins. Co. of Vermont*, 318 F.3d 105, 111 (2d Cir. 2003) (internal quotation marks omitted). "For the conduct of a private entity to be fairly attributable to the state, there must be such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Id.* (internal quotation marks omitted). "The purpose of [the close-nexus] requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (emphasis in original).

A court's analysis of whether a private entity's conduct meets this standard is a "necessarily fact-bound inquiry. . . ." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982); *see also Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722 (1961) ("Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance."). A private entity's conduct "may be deemed state action when the state exercises coercive power, is entwined in [the] management or control of the private actor, or provides the private actor with significant encouragement, either overt or

---

[28] As noted above, when I refer to Park West, I refer to both Park West Apartments, Inc. and The Community Builders, Inc.

covert, or when the private actor operates as a willful participant in joint activity with the State or its agents, is controlled by an agency of the State, has been delegated a public function by the state, or is entwined with governmental policies." *Cranley*, 318 F.3d at 112 (internal quotation marks omitted).

As this standard suggests, the line between state action and private conduct can be difficult to pin down. There are certain factors, however, which affirmatively do not create state action. For example, "[a] finding of state action may not be premised solely on the private entity's creation, funding, licensing, or regulation by the government." *Id.* (citing *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522, 543-44 (1987). "Government funding of a private entity, . . . no matter how extensive, is insufficient to transform otherwise private conduct into state action." *Young v. Halle Hous. Assocs., L.P.*, 152 F. Supp. 2d 355, 362 (S.D.N.Y. 2001). Further, "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999).

The record does not reflect a "close-nexus" between the State and Park West's actions underlying this case. As an initial matter, the mere fact that Park West receives funding from HUD via residents' housing subsidies and, through its relationship with HUD, is subject to government regulation, does not render its conduct state action. *See Young*, 152 F. Supp. 2d at 362-63 (concluding that private housing project's heavy reliance upon government funding including HUD rent subsidies and extensive government regulation did not render it a state actor); *Kabbani v. Council House, Inc.*, 406 F. Supp. 2d 1189, 1194 (W.D. Wash. 2005) (concluding that housing project was not state actor despite fact that it received substantial money from HUD, was subject to substantial federal regulations, had to obtain HUD approval of

its leases, and used State eviction procedures); *X-Men Sec., Inc. v. Pataki*, 983 F. Supp. 101, 110 (E.D.N.Y. 1997) (concluding that fact that private housing provider was "subject to extensive regulation" and "publicly subsidized" did not "turn their owners into state actors"), *on reconsideration* (Oct. 29, 1997), *and rev'd on other grounds*, 196 F.3d 56 (2d Cir. 1999).

More significantly, there is no apparent relationship between the State and Park West's actions against DeSouza. *See Young*, 152 F. Supp. 2d at 364 ("[T]he crucial relationship for a finding of state action is between the governmental entity and the *action* taken by the private entity, not . . . between the governmental entity and the private *actor*."). DeSouza does not argue that any governmental entity was involved in Park West's decision to initiate eviction proceedings against him. For example, he does not contend that HUD ordered Park West to evict him or that HUD was in any way involved in Park West's decision to initiate eviction proceedings against him.[29] At best, DeSouza could claim that the recertification requirements themselves were originally promulgated by HUD and that their incorporation into his lease, along with his subsequent eviction, constitutes state action. This attenuated connection, however, does not constitute the "close-nexus" required to transform private conduct into state action. *See Spavone v. Transitional Servs. of New York Supportive Hous. Program (TSI)*, No. 16-CV-1219 (MKB), 2016 WL 2758269, at *4 (E.D.N.Y. May 12, 2016) (holding that constitutional claim failed "because [p]laintiff fail[ed] to allege any state involvement in the *precise conduct* on which [p]laintiff's claims are based" (emphasis added)); *contrast Jones v.*

---

[29] Indeed, he argues just the opposite—that Park West wished to evict him at least in part because his filing of HUD complaints was jeopardizing its contract with HUD. (*See* ECF No. 151-2 at 8 (claiming that his lawyer told him that "the real reason [he was] being evicted [was] because . . . [Park West staff] and atty. Neil Paul are under extreme pressure to have you evicted for constantly filing complaints with HUD-DC . . . since they are very much afraid to lose their contract with HUD . . . .").)

*Cty. of Suffolk*, No. 15-CV-0111(JS)(ARL), 2018 WL 2023477, at *11 (E.D.N.Y. May 1, 2018) (concluding that governmental entity's actual administration of program with private actor and maintenance of control over said program rendered private actor's conduct state action).

I therefore grant Park West's motion for summary judgment with respect to DeSouza's First Amendment claim.

### e. Fourth Amendment Claim (Count 5)

DeSouza's Fourth Amendment claim alleges effectively the same conduct as his claims addressed above. He avers that Park West "grossly discriminated" against him based upon his racial ethnicity and that it then "retaliated against [him] . . . with the sole intent to destabilize [his] household and security secured . . . under [the] Fourth (IV) Amendment." (ECF No. 100-2 at 18.) Putting aside the fact that DeSouza's claim fails at the outset given that Park West's conduct does not constitute state action for the reasons set out above, the claim also fails on the merits. DeSouza's count does not make any mention of an illegal search or seizure, the hallmark violations of the Fourth Amendment. *See, e.g.*, *Velazquez v. Thompson*, 321 F. Supp. 34, 38 (S.D.N.Y. 1970) (rejecting plaintiff's claim that marshal's entry pursuant to court ordered warrant of eviction constituted violation of Fourth Amendment due to lack of unreasonable search or illegal seizure). Liberally construed, DeSouza's claim avers that Park West's attempt to evict him constituted an attempt to "seize" his home in violation of the Fourth Amendment. This argument falters for three reasons. First, Park West's initiation of lawful eviction proceedings hardly constitutes an unlawful seizure of DeSouza's property. Second, DeSouza's apartment was never "seized" in any event given that he was never evicted. *Contrast Soldal v. Cook Cty.*, Ill., 506 U.S. 56, 62 (1992) (police's seizure of plaintiff's mobile home constituted "seizure" for purposes of Fourth Amendment). Finally, even if it was, DeSouza's claim would

fail in any event given the absence of state action in this case.  *See Int'l Bhd. of Teamsters,*

*Chauffeurs, Warehousemen & Helpers of Am.,* 941 F.2d at 1295.

I therefore grant Park West's motion for summary judgment with respect to DeSouza's

Fourth Amendment claim.

### e.  Privacy Act Claim (Count 8)

DeSouza alleges that Park West violated his rights under the Privacy Act by disclosing

information regarding the eviction proceedings against him to "numerous third parties" without

his consent.  (ECF No. 100-2 at 19).  The Privacy Act, "codified in part at 5 U.S.C. § 552a,

'contains a comprehensive and detailed set of requirements for the management of confidential

records held by Executive Branch agencies.'"  *Conyers v. United States Dep't of Veterans*

*Affairs*, No. 16CV00013JFBSIL, 2018 WL 1867106, at *6 (E.D.N.Y. Jan. 29, 2018), *report and*

*recommendation adopted*, No. 16CV0013JFBSIL, 2018 WL 1089736 (E.D.N.Y. Feb. 26, 2018)

(quoting *F.A.A. v. Cooper*, 566 U.S. 284, 287 (2012)).  The Second Circuit has limited "the

private right of civil action created by the Privacy Act," however, "to actions against agencies of

the United States government."  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d

Cir. 2008) (citing *Unt v. Aerospace Corp.*, 765 F.2d 1440, 1447 (9th Cir. 1985) ("The civil

remedy provisions of the Privacy Act do not apply against private individuals, state agencies,

private entities, or state and local officials." (citations omitted))).  Since the record does not

reflect and DeSouza does not allege that the defendants are agencies of the United States

government, his claim under the Privacy Act fails as a matter of law.

I therefore grant Park West's motion for summary judgment with respect to DeSouza's

Privacy Act claim.

### f.  Slander and Intentional Infliction of Emotional Distress Claim (Count 9)

DeSouza's final claim avers that Park West committed the torts of slander and or intentional infliction of emotional distress through Ms. Doughtie's alleged statements to a police officer that he "had viciously sexually assaulted and raped both [Ms. Doughtie's] daughter . . . and her little 20-month old baby girl and mercilessly left them in a pool of blood. . . ." (ECF No. 100-2 at 14, 19.)  In support of this contention, DeSouza attaches as an exhibit to his objection an affidavit from a neighbor, Wendy Secore, attesting that this took place at a party at Park West on or around July 26, 2014.  (ECF No. 151-3, Pl.'s Exh. 8, at ¶ 21 (stating that Ms. Doughtie told the officer that DeSouza "just broke into my daughter's apartment, raped by daughter and her 10-month old baby and let [sic] them in blood of blood [sic]".)  Park West attached to their motion for summary judgment a police report from July 26, 2014, that omits any mention of this incident.  (ECF No. 130-26, Exhibit Z, at 2-3 (making no mention of Ms. Doughtie's allegation or, indeed, Ms. Doughtie).)  While this question of fact "cannot be resolved on the basis of conflicting affidavits," *Molinaro v. Sears, Roebuck & Co.*, 478 F. Supp. 818, 823 (S.D.N.Y. 1979), Desouza's claims nonetheless fail as a matter of law.

Since DeSouza has alleged his common law tort claims against a corporate defendant for the intentional actions of its employee, he may establish his claim through one of two theories of liability.  First, "under the common-law principle of respondeat superior, an employer is vicariously liable for compensatory damages arising out of the tortious conduct of his employee when that conduct occurs during the course of the employee's employment."  *Matthiessen v. Vanech*, 266 Conn. 822, 839 (2003) (emphasis omitted).  Second, a plaintiff may allege, "independent of any vicarious liability," "that the corporation committed, directed or ratified the intentional act."  *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 505 (1995) (describing corporate liability for employees' torts separate from respondeat superior liability).  "In order for

direct liability to attach to [Park West], therefore, agents of the corporation, acting on behalf of the corporation, must have authorized or ratified the wrongful acts." *Id.* To establish such liability, a plaintiff must demonstrate that "agents of the corporation, acting on behalf of the corporation, must have authorized or ratified the wrongful acts." *Id.*

DeSouza's claim fails under both of these theories. In order to establish that an employee committed a tort "within the scope of her employment," a plaintiff must establish that the employee committed the tort "while engaged in the service of the master." *Levitz v. Jewish Home for the Aged, Inc.*, 156 Conn. 193, 198 (1968). "Thus, 'it must be the affairs of the principal [or master], and not solely the affairs of the agent [or servant], which are being furthered in order for this doctrine to apply.'" *Matthiessen*, 266 Conn. at 839 n. 15 (quoting *Mitchell v. Resto*, 157 Conn. 258, 262 (1968)). DeSouza fails to present any possible way that Ms. Doughtie's alleged accusation could serve Park West's interests. Further, the accusation plainly does not fall within Ms. Doughtie's duties as an employee of Park West. Thus, DeSouza's claim against Park West fails under the doctrine of respondeat superior liability. It fares little better under general corporate liability. The record does not contain any evidence suggesting that any agents of Park West authorized or ratified Ms. Doughtie's purported sexual assault allegations.

For these reasons, I grant Park West's motion for summary judgment with respect to DeSouza's state tort claims.

## V.     Conclusion

For the foregoing reasons, Park West's motion for summary judgment (ECF No. 128) is hereby GRANTED IN PART AND DENIED IN PART. The motion is denied with respect to the portion of DeSouza's retaliation claims under the FHA regarding Park West's filing of the

second affidavit of noncompliance in March, 2015 (Counts 1, 2, 3, 6) and granted with respect to the remainder of his claims.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              June 14, 2018